## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

BAIS BRUCHA INC. and RABBI
MORDECHAI SEKULA,

                Plaintiffs,

   v.

TOWNSHIP OF TOMS RIVER, NEW
JERSEY and TOWNSHIP OF TOMS RIVER
ZONING BOARD OF ADJUSTMENT,

          Defendants.

Civ. No. 3:21-cv-03239-ZNQ-RLS

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiffs, Bais Brucha Inc. ("Bais Brucha") and Rabbi Mordechai Sekula ("Plaintiffs"),

by their undersigned attorneys, complain of Defendants, Township of Toms River ("Township")

and Township of Toms River Zoning Board of Adjustment ("Board") (collectively, the

"Defendants"), as follows:

## NATURE OF ACTION

1.    This action is commenced by Plaintiffs to redress violations of their civil rights,

as protected by the Free Exercise and Equal Protection Clauses of the United States Constitution,

42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act of 2000, *et seq.*

("RLUIPA") caused by the Defendants' discriminatory and burdensome land use regulations and

intentional conduct that have prohibited and continue to prohibit Plaintiffs from constructing a

synagogue on its property located at 1191 and 1181 Hickory Street in Toms River (the "Subject Property").

2.      Plaintiffs purchased the Subject Property, located in the Township's Rural Residential zoning district for the purpose of constructing a small synagogue ("*shul*") for Orthodox Jews.

3.      In recent years, Orthodox Jews have been moving to Toms River--especially the Township's North Dover area--in increasing numbers. In response to the rising Orthodox Jewish population in Toms River, the Township has engaged in an orchestrated campaign to prevent that community from growing in the Township, including the passage of targeted and discriminatory zoning regulations that prevent the construction of synagogues. In order to build a house of worship--regardless of how small--anywhere within the Township, a lot greater than <u>ten acres</u> must be acquired,[1] which effectively eliminates the possibility of new synagogues locating in the Township. Many other nonreligious institutional and assembly uses require much smaller lots or even have no acreage restriction at all.

4.      Additionally, houses of worship are prohibited in the Rural Residential ("RR") zoning district in which the Subject Property is located,[2] while numerous other nonreligious assembly and institutional land uses are permitted in that zone.

5.      Plaintiffs' efforts to build a *shul* have taken place during a rising tide of anti-Semitism among the Toms River government and its population, fearful that the Orthodox Jewish community located in adjacent Lakewood Township will extend into their jurisdiction. Significant evidence of the anti-Semitic hostility of Toms River residents has frequently

---

[1] Ordinance 4700-21, which was enacted on July 13, 2021, lowered the minimum lot size to two (2) acres for houses of worship.
[2] Pursuant to Ordinance 4700-21, houses of worship are now a conditional use in the RR zone.

appeared online in petitions, on social media and news websites, where statements referred to Orthodox Jews as "cockroaches," "parasites," a "cult," "damn jews," "dirty," and a "disease." On a petition signed by 5,095 people, one Toms River resident stated: "Keep these damn jews out of Toms River.. There will be issues if this passes... I promise." Anti-Semitic graffiti has been found in Toms River, including the words "Burn the Jews," which were scratched into playground equipment at Riverwood Park. Not only did this incident fail to raise outrage in the local community, but many published local comments were more sympathetic to the perpetrators than to the Jewish population. In another Toms River park, the word "Hitler" with a heart was engraved on the playground, and swastikas have been found etched on a car, carved into a lawn and spray painted on a driveway in the Township.

6.       Responsive to this hostility, the Township and its officials have taken many targeted actions against Orthodox Jews in recent years, including acquiring properties by purchase and eminent domain in order to prevent Orthodox Jews from constructing new houses of worship, schools and residential developments in the North Dover neighborhood of Toms River.

7.       Additionally, the Township's discriminatory laws and practices attracted the scrutiny of the United States Department of Justice ("DOJ"), which resulted in a lawsuit filed by the DOJ in this Court, concluding with a Consent Order entered between the Township and the DOJ.  Pursuant to that Consent Order, the Township was required to amend its land use regulations to remove all provisions that discriminated against houses of worship.  The Township thereafter amended its land use regulations to give the appearance of compliance with the Consent Order, while in fact continuing to discriminate against houses of worship.  As a result of that continued discrimination, the DOJ again informed the Township that its new

amendment may violate the Consent Order.  In response, the Township amended its code a second time, but still failed to eliminate its discriminatory provisions.  The Township's laws and actions continue to discriminate against religion, were motivated by religious animus, and have prevented Plaintiffs from engaging in their religious exercise.

## JURISDICTION AND VENUE

8.      The subject matter jurisdiction of this Court is founded upon 28 U.S.C. § 1331 (federal question jurisdiction) in that this action is brought under 42 U.S.C. § 1983, and 42 U.S.C. § 2000cc, *et seq*.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that all of the events giving rise to the claims herein occurred in this District and the Defendants are subject to personal jurisdiction in this District as of the commencement of this action.

## PARTIES

10.      Plaintiff BAIS BRUCHA INC. is a domestic non-profit corporation located in Ocean County, New Jersey, with an address of 1191 and 1181 Hickory Street, Toms River, NJ 08755.

11.      RABBI MORDECHAI SEKULA is a United States citizen and a resident of the state of New Jersey.

12.      Defendant TOWNSHIP OF TOMS RIVER, N.J. ("Township" or "Toms River") is a municipal corporation of the State of New Jersey, having offices at 33 Washington Street, Toms River, New Jersey 08753.

13.      Defendant TOWNSHIP OF TOMS RIVER ZONING BOARD OF

ADJUSTMENT is a zoning board organized under N.J.S.A. 40:55D-69 and continued under Section 348-3.2 of the Code of the Township of Toms River. It has an address of 33 Washington Street, Toms River, New Jersey 08753.

## FACTUAL ALLEGATIONS

### Plaintiffs' Religious Exercise

14.     A synagogue is an essential part of religious exercise for Orthodox Jews.

15.     Plaintiffs believe that Orthodox Jews must live within walking distance of their synagogue because they are prohibited by Jewish law from driving to synagogue on the Sabbath and on numerous holy days throughout the year.

16.     The number of Orthodox Jews who live within walking distance of the Subject Property has been steadily growing.

17.     Rabbi Sekula is currently holding worship services in the basement of his home on the Subject Property, which is not large enough to accommodate all who desire to attend.

18.     At the current location, people attending Rabbi Sekula's services are sometimes turned away because of the lack of space.

19.     Bringing children to synagogue is an important part of Plaintiffs' religious beliefs.

20.     Bais Brucha's congregants have been told to leave their children at home because of the lack of space at the current facilities.

21.     Because families are unable to bring their children to synagogue, many congregants do not come to worship services at the Subject Property at all.

22.     Plaintiffs are suffering significant hardships to their religious exercise resulting from a lack of an adequate place of worship.

23.    Plaintiffs cannot engage in certain religious activities because of the lack of adequate physical facilities at the Subject Property.

24.    The current structure does not have a *mikveh*, a Jewish ritual bath, which is a necessity of Jewish life.

25.    Currently, there is no *mikveh* in Toms River, and Bais Brucha's congregants must walk a significant distance to a *mikveh* in Lakewood on an unsafe road with no streetlights or shoulder.

26.    The trek to the Lakewood *mikveh* is even more dangerous in inclement weather.

27.    Bais Brucha's congregants are forced to risk their safety on the walk to the *mikveh* in Lakewood, or else forgo this essential religious ritual.

28.    The current structure lacks a social hall and cannot accommodate religious life cycle events such as Bar Mitzvahs, Aufruf and Sheva Brachot, which hinders the growth of the community.

29.    The current structure has no place for congregants to meet, socialize, or have fellowship.

30.    The shortage of space fragments the community because a large cohesive gathering of Bais Brucha's congregants is not possible.

31.    Rabbi Sekula cannot speak to the entire congregation at one time.

32.    Congregants must leave the community and travel to Brooklyn and Lakewood for religious life cycle events which further fractures the religious community and hinders its growth.

33.    Building a cohesive religious community is an important part of Plaintiffs' religious exercise.

34.     Currently, Bais Brucha has no space for a religious education program for adults or children.

35.     Boys at Bais Brucha cannot have their own educational program and cannot study together.

36.     Girls at Bais Brucha also are unable to receive religious instruction.

37.     There is no space for a research library at Bais Brucha, which is essential for Plaintiffs' religious practice.

38.     The absence of a research library also hinders the growth of Bais Brucha's religious community.

39.     Nightly *Shiur*, a Talmudic study session, is limited by the number of people who can fit into the existing space at the Subject Property.

40.     There is no space at the Subject Property to host guest lecturers or speakers.

41.     Congregants are unable to keep their *tallitot* (prayer shawls) and *siddurim* (prayer books) at the Subject Property as is customary because there is no space.

42.     The current basement at the Subject Property has a low ceiling with poor sound projection.

43.     Because the sections for men and women in the basement are separated by a concrete wall, women cannot hear Bais Brucha's religious services.

44.     The stairs descending to the basement where services are held at the Subject Property are not handicapped accessible.

45.     Congregants have said that they will not come to Bais Brucha because it is the Rabbi's home and they do not want to intrude on his privacy.

46.     The men's entrance is located on the exterior of the house, but women must walk

7

through the residence to get to the prayer room.

47.     There is no kitchen for *Kiddush*.

48.     Women have to move out of their sanctuary room for *Kiddush*.

49.     Rabbi Sekula does not have his own office at the Subject Property, and people must therefore come into his home for advice, counseling, and dispute resolution.

50.     Currently, there is no space for the administrator of Bais Brucha.

51.     Plaintiffs need a synagogue that can meet their religious needs.


Subject Property

52.     The Subject Property is located at 1191 and 1181 Hickory Street in Toms River, New Jersey, Block 191, Lots 1.01 and 1.02 on the tax map of Toms River in the Rural Residential ("RR") zone.

53.     The Subject Property is located on the corner of Hickory Street and Vermont Avenue, and is adjacent to the unimproved streets of Clark Avenue and Fillmore Street.

54.     In December of 2017, Plaintiff Bais Brucha purchased the Subject Property.

55.     Plaintiffs seek to construct a small *shul* with a building footprint of 4,680 square feet on the Subject Property next to the existing dwelling, where Rabbi Sekula lives with his family.

56.     The proposed structure will include a sanctuary that can accommodate men and women, a social hall, *mikveh* and library.

57.     On April 17, 2019, the Township issued a Notice of Violation and Order to Terminate to Bais Brucha, stating that

        you have been found to be in violation of the State Uniform Construction

8

Code Act and Regulations promulgated thereunder in that:
Change of use without a permit in violation of NJAC 5:23-2.14(a)[.]
Assembly use and occupancy established within R5 use: basement areas.
No permits or prior approvals.

Bais Brucha was ordered to terminate the said violations within 14 days or could be fined $500 per week per violation.

<u>Applicable Land Use Regulations</u>

58.     Toms River regulates land use in its jurisdiction in part through Chapter 348 of the Toms River municipal code (the "Code").

59.     At the time Bais Brucha submitted its Application, § 348-9.5 of the Code stated that "Churches and places of worship" were permitted as a conditional use in certain zones where specified, subject to the following standards:

A.     The minimum lot area shall be 10 acres.

B.     The minimum lot width shall be 300 feet.

C.     No principal building shall be located closer than 50 feet to any side or rear property line.

D.     No accessory building shall be located closer than 30 feet to any side or rear residential property line.

E.     Maximum lot building coverage shall be 15%.

F.     Maximum impervious coverage shall be 40%.

G.     The height of structures to be constructed may exceed the maximum height requirements of this chapter; provided, however, that the front, rear and side yard requirements set forth above shall be increased by two feet for each foot by which the height of the structure exceeds the maximum height which would be otherwise permitted by the chapter, and further provided that in no case shall any proposed structure exceed 50 feet in height.

H.     The property must front on a street classified as a major collector, minor arterial or principal arterial roadway.

9

60.        A use that is not specifically allowed or permitted in a particular zone is a prohibited use.  Code § 348-2.3.

61.     No use shall be considered a permitted use or a conditional use in a zone district unless included as such in the particular zone district. Code § 348-5.2(E).

62.     At the time Bais Brucha submitted its application, churches and places of worship were not allowed as either a permitted or conditional use in the RR zone.

63.     In the Rural Residential Zone ("RR"), where the Subject Property is located, permitted conditional uses include many other nonreligious assembly and institutional land uses, including:

1)     Public utilities (Code § 348-9.6).

2)     Nursery schools and day nurseries (Code § 348-9.7).

3)     Health care facilities (Code § 348-9.8).

4)     Quasi-public and private club recreation areas (Code § 348-9.18).

5)     Farmers' markets or auction markets (Code § 348-9.20).

6)     Administrative offices and research laboratories (Code § 348-9.22).

7)     Continuing-care retirement community (Code § 348-9.27).

8)     Long-term residential health care facilities (Code § 348-9.29).

9)     Home professional offices (Code § 348-9.11).

64.      Such nonreligious assembly and institutional land uses were treated on better terms under the Township's land use regulations than are places of worship, which were not permitted to seek conditional use approval to locate on the Subject Property at the time the application was filed.

65.      Former subsection (D)(1) of § 348-10.5, which included churches and places of

worship in the RR zone as conditional uses, was repealed in March 2009 by Ordinance Number 4181-09.

66.     In March 2009, the Township Council also removed churches and places of worship as a conditional use from four other residential zones: R-800, R-400, R-400C, and R/C-3.

67.     At the time Bais Brucha submitted its Application, the minimum lot area requirement for houses of worship in zoning districts, where they were still permitted, was ten acres.

68.     Minimum lot area requirements for various other non-religious assembly and institutional land uses in the Township include:

1)     Nursery schools and day nurseries: Two acres. Code § 348-9.7.B(1)

2)     Health care facilities: No minimum lot size. Code § 348-9.8

3)     Farmers' markets or auction markets: One acre. Code § 348-9.20(A)

4)     Public utilities: 20,000 square feet or less. Code § 348-9.6(F)

5)     Hotels and motels: One acre. Code § 348-9.15(A)

6)     Veterinary clinics, hospitals and animal care facilities: one acre. Code § 348-9.17(A)

7)     Quasi-public and private club recreation areas: five acres. Code § 348-9.18.A(1)

8)     Administrative offices and research laboratories: five acres. Code § 348-9.22(A)

9)     Motor vehicle service stations: 15,000 square feet. Code § 348-9.3(B)

10)    Home professional office: 12,000 sq. ft. for interior lot; 15,000 sq. ft. for

11

corner lot. Code § 348-9.11

11) Boarding houses and rooming houses: No minimum lot size. Code § 348-9.13

12) Continuing-care retirement communities: No minimum lot size. Code § 348-9.27

13) Shopping centers: No minimum lot size. Code § 348-9.16

14) Commercial recreation activities: No minimum lot size. Code § 348-9.19

15) Boatyards and/or marinas: No minimum lot size. Code § 348-9.10

16) Retail and office uses: No minimum lot size. Code § 348-9.21

69. Other institutional and assembly uses in Toms River are treated on better terms than religious land uses, which had a minimum lot area requirement of 10 acres at the time the Application was filed.

70. Plaintiffs did not need ten acres to build their small *shul*.

71. The ten-acre requirement for houses of worship was impracticable for Plaintiffs.

72. Upon information and belief, a 1.22 acre lot near the Subject Property was recently sold for $650,000.

73. Even assuming an adjacent series of lots could be found, compiling ten acres in that neighborhood would (at a cost of $650,000 for 1.22 acres) cost over $5,000,000 for the property alone.

74. Plaintiffs cannot afford to pay five million dollars for property for their *shul*.

75. The minimum lot width for Churches and places of worship, where they are permitted, was 300 feet at the time the application was filed.

76. Minimum lot width requirements for various non-religious assembly and

institutional uses in the Township include:

1)      Motor vehicle service stations: None. Code § 348-9.3.

2)      Nursery schools and day nurseries: None. Code § 348-9.7

3)      Boarding houses and rooming houses: None. Code § 348-9.13

4)      Hotels and motels: None. Code § 348-9.15

5)      Veterinary clinics, hospitals and animal care facilities: None. Code § 348-9.17

6)      Quasi-public and private club recreation areas: None. Code § 348-9.18

7)      Continuing-care retirement communities: None. Code § 348-9.27

8)      Bed and breakfast establishments: None. Code § 348-9.30

9)      Private and parochial schools: None. Code § 348-9.4

10)     Boatyards and/or marinas: None. Code § 348-9.10

11)     Home professional office: 90 ft. for interior lot. Code § 348-9.11

12)     Farmers' markets or auction markets: None. Code § 348-9.20

13)     Planned unit developments: None. Code § 348-9.24

14)     Public utilities: None. Code § 348-9.6

15)     Retail and office uses: None. Code § 348-9.21

77.     The maximum impervious coverage requirement for Churches and places of worship, where they are permitted, was 40% at the time the application was filed.

78.     Maximum impervious requirements for various non-religious assembly and institutional uses in the Township include:

1)  Motor vehicle service stations: 80%. Code § 348-9.3.O

2)  Nursery schools and day nurseries: 50%. Code § 348-9.7.B(5)

3) Hotels and motels: 80%. Code § 348-9.15.E

4) Quasi-public and private club recreation areas: 70%.  Code § 348-9.18.A(3)

5) Administrative offices and research laboratories: 80%. Code § 348-9.22.F

6) Continuing-care retirement communities: 70%. Code § 348-9.27C(5)

7) Veterinary clinics, hospitals and animal care facilities: no maximum specified. Code § 348-9.17

8) Boarding houses and rooming houses: no maximum specified. Code § 348-9.13

9) Public utilities: no maximum specified. Code § 348-9.6

10) Farmers' markets or auction markets: no maximum specified. Code § 348-9.20

11) Home professional office: no maximum specified. Code § 348-9.11

12) Boatyards and marinas: no maximum specified. Code § 348-9.10

13) Retail and office uses: no maximum specified. Code § 348-9.21

14) Planned unit developments: no maximum specified. Code § 348-9.24

15) Bed-and-breakfast establishments: no maximum specified. Code § 348-9.30

79.     On its face, the Township's Code discriminated against religious land uses and in favor of various nonreligious assembly and institutional uses by prohibiting Churches and places of worship in the RR district, by requiring greater lot areas, by requiring a greater minimum lot width requirement, and permitting less impervious surface coverage.

<u>Application</u>

80.     On August 26, 2020, Plaintiff Bais Brucha filed an application with the Township

for a zoning permit to construct a house of worship with a 4,680 square foot building footprint on a vacant lot adjacent to the existing dwelling on the Subject Property (the "Application").

81.    The Application, which included the Zoning Permit Application, a narrative description, concept plan, and the property owner authorization, was complete.

82.    Bais Brucha complied with all Township ordinance and state law requirements in its Application submitted to the Township's zoning officer.

83.    Plaintiff Bais Brucha owns the Subject Property.

84.    In its Application, Bais Brucha sought to have its *shul* deemed a permitted conditional use in the RR zone.

85.    Many of the Township's other churches and houses of worship are already located in the RR zone.

86.    Bais Brucha also sought to have the combined lot size of 80,018 deemed permitted for its *shul.*

87.    Many of the Township's churches exist on properties much smaller than ten acres, including the following:

First Church of Nazarene: 1.19 acres

Trinity Church Ministries Inc.: 1.21 acres

Toms River Seventh-Day Adventist Church: 1.56 acres

Toms River Church of Christ: 1.74 acres

Kingdom Hall of Jehovah's Witnesses: 2.03 acres

Bethany Bible Chapel: 2.39 acres

Pinelands Reformed Church: 2.5

The Church of Jesus Christ of Latter-Day Saints: 3.91 acres

15

Faith Baptist Church: 4.06 acres

Abundant Grace Church: 4.88 acres

Holy Cross Lutheran Church: 5.24 acres

East Dover Baptist Church: 6.24 acres

88.     On September 24, 2020, Plaintiff's application was denied by the Zoning Officer. The denial stated: "Use not permitted in RR Zone."

### Zoning Board of Appeals Decision

89.     Bais Brucha appealed the denial of its application to the Zoning Board of Appeals ("ZBA") and a meeting was held on January 14, 2021.

90.     The ZBA upheld the denial of Plaintiff's application on the sole basis that a house of worship is not a permitted use in the RR Zone.

91.     RLUIPA permits governmental discretion in alleviating burdens on religious exercise by authorizing governments to "provid[e] exemptions from the policy or practice for applications that substantially burden religious exercise, or by any other means that eliminates the substantial burden." 42 U.S.C. § 2000cc-3(e).

92.     Bais Brucha requested such an exemption pursuant to 42 U.S.C. § 2000cc-3(e) from the Zoning Board.

93.     In its denial, the ZBA stated that it "has no power or authority to grant the applicant's appeal of the denial of the Zoning Permit under the facts and law presented" and is "not a local government pursuant to RLUIPA."

94.     The ZBA's decision is a final decision on Plaintiff's application, as there are no further administrative avenues of appeal within the Township of Toms River.

95.     Upon information and belief, less than three weeks after the January 14, 2021 public hearing held by the Defendant board, certain local residents complained to the Township about the use of the Subject Property.

96.     On Friday, February 5, 2021, at approximately 4:10 p.m., which was less than one hour before the start of *Shabbos* (the Jewish Sabbath), a Township official from Defendant Township's Division of Code Enforcement, Tony Vasquez, came unannounced to the Subject Property in response to complaints by certain Township residents.

97.     As Rabbi Sekula was preparing for *Shabbos*, his minor son answered the door, and Mr. Vasquez interrogated the boy about the use of the Subject Property and Rabbi Sekula, before taking pictures of a box on the porch and two vehicles parked in their driveway.

Hostility Toward Orthodox Jews in Toms River

98.     Significant hostility against Orthodox Jews exists on the part of the government and residents of Toms River.

99.     The Township has been responsive to local Toms River residents' hostility toward Orthodox Jews.

100.     In 2009, the Township council passed a law requiring at least 10 acres of property for any new house of worship in parts of Toms River with larger lot sizes, including most of North Dover which is where the majority of the Orthodox Jewish population is concentrated.

101.     In 2012, the Township planner indicated to a resident concerned about a nearby synagogue that "we have eliminated houses of worship and schools from the large lot zoning districts throughout Toms River."

102.     In 2014, the Toms River Township Council spent $1,514,730 to purchase 7.2

acres near the Lakewood border where Lakewood developer Charles Silberg planned to build a 3,000-square-foot synagogue. Silberg had purchased the vacant land for $350,000 in 2012. When Silberg first proposed the project, the land was zoned for rural highway business, which at the time allowed churches and synagogues to be built in the area. However, in August 2014, the council rezoned the land for residential use, and as a result, church and synagogue use was no longer permitted on the land.

103.    In 2015, the Township conducted an analysis of vacant parcels in excess of seven acres in North Dover, assessing the potential for future development and identifying parcels that are zoned in districts that permit churches and houses of worship as a conditional use.

104.    At the same time, the Township began the process of acquiring parcels of ten acres or more that could potentially be used as synagogues by purchase or eminent domain.

105.    Upon information and belief, the purpose of the Township's acquisitions of parcels of ten acres or more was to prevent Orthodox Jews from building houses of worship in the Township and to prevent more Orthodox Jews from moving to Toms River.

106.    In 2016, the Township Council approved Ordinance No. 4508-16 to acquire by purchase or eminent domain, *inter alia*, a 35-acre property that was under contract for purchase by Orthodox Jewish developers who planned to develop multi-family housing that would include amenities which would be desirable to Orthodox Jews, as well as a structure for a small place of worship. The Township subsequently acquired the property through eminent domain.

107.    In October of 2017, the council passed Ordinance 4558-17, expanding the reach of the 10-acre requirement for houses of worship to the entire Township.

108.    Former Mayor of Toms River, Thomas Kelaher was quoted in March 2016 as saying "It's like an invasion," referring to Orthodox Jews moving into Toms River.

109.    Mayor Kelaher's statement was condemned by the Anti-Defamation League and Agudath Israel of America.

110.    Mayor Kelaher further stated: "Let's assume that I used that word. What I was referring to is the sworn testimony of neighbors in the North Dover area, who testified and used that term, that they feel like it's an invasion. That's the context in which I used it. The people who live there think that."

111.    Mayor Kelaher was also quoted as saying that Orthodox Jews are trying to buy homes in his town and that if local homeowners don't sell, they will be the only non-Orthodox left.

112.    Mayor Kelaher was further quoted as saying "[y]ou know what's going on in Lakewood, they want to make it the Yeshiva capital of the world and God bless them if they do, but they're using up all the space in Lakewood and they're spilling over."

113.    Campaign materials sent by the Committee to Re-Elect Tom Kelaher Mayor, Carmen Memoli Treasurer have included statements such as "While Treasurer of the Lakewood Democrats, Pontoriero Team Council Candidate Michael Bateman helped raise tens of thousands of dollars from the special interests who helped shape Lakewood into what it has become today.... On November 3rd say NO to The Pontoriero/Bateman Democrats Toms Rivers [sic] Future depends on it !"

114.    On March 1, 2016, the words "Burn the Jews" were carved into playground equipment at Riverwood Park in Toms River.

115.    Concerning that incident, a Toms River police department spokesman stated: "An investigation was opened and we are trying to determine if this graffiti was done by ignorant teenagers or was of a more direct and sinister nature directed at the Jewish faith," suggesting that

the statement "Burns the Jews" could be interpreted as anything other than a statement "of sinister nature directed at the Jewish faith."

116.    Later in March 2016, more graffiti was found at Riverwood Park where a bench was defaced with the words "Jews go back to Lakewood."

117.    Comments on local media websites made regarding the "Burn the Jews" incident include:

1)    "Drive one day in Lakewood around 9 am or Friday afternoon around 2 and you will see why no one wants them in their area!"

2)    "The Orthodox Jewish extremists are making their way into Manchester Hollyoaks park. Give it 20yrs. And Manchester Twp. Will turn into next Lakewood. The Orthodox tried to pulled some stunt in Jackson a couple of years ago only to have their children in the public park two days out of the week, that didn't fly with the local residents of Jackson Twp. It went to litigation and did not pass. Even the State of Israel has a major problem with them. The bad part of this is the Orthodox go by their own Jewish laws and do not agree with the American laws. Write to your congressman, senators, local officials and complain! How about when summer comes along and your children want to play in the water to cool down, to have a Orthodox man tell your children to cover up their swimwear, because it offends their religion. How about LAKEWOOD build their own park."

3)    "Oh no, who gives a s#¡t? Honestly, who cares? Get over it. It's not threatening at all, what you have is some stupid kids in the 12-16 age group thinking their edginess is hilarious. The fact that they're even making an issue about this is ridiculous. And to top it off, the other comments are right. The TR park is for TR residents. Not Lakewood ones."

4)    "[O]ne of the main things that [the Mayor] is missing here is that Riverwood Park along with all of the other parks in Toms River Township is the for the RESIDENTS OF TOMS RIVER. It is clearly posted on the rules of the park but apparently these rules do not apply to the residents of Lakewood, who do NOT pay taxes in Toms River (nor their own town of Lakewood) but want to use the facilities of those provided by the tax payers. [T]hose that have voted for him and pay taxes in Toms River protect the parks and recreational areas that we the citizens of Toms River pay for and

want to enjoy but can't because they are overrun by people who do not belong in the Township Parks"

5)   "It's pretty sad, when we New Jersians can't tell the difference between some dumb kids scribbling some misspelled garbage on a kids playset, and an actual hate crime, Besides, nine times out of ten these so-called hate crimes are self inflicted. Look up the statistics and see for yourselves."

6)   "Probably a local parent at wits end. Did you ever go to Riverwood park, kids from Toms River can't even play there because it's overrun by out of towners."

118.   To coordinate their efforts to keep Orthodox Jews out of the Township, certain residents of Toms River started a grassroots movement called "Toms River Strong."

119.   Many Toms River residents placed lawn signs on their properties that state: "DON'T SELL! TOMS RIVER STRONG."

120.   Upon information and belief, such signs and statements are intended to prevent the Orthodox Jewish community from purchasing homes in Toms River.

121.   Statements regarding the "DON'T SELL!" And "TOMS RIVER STRONG" phrases used by local residents include:

1)   Don't let Toms River become part of Lakewood. Don't be sellouts and allow this to happen.

2)   Will not allow them to take over TR. This is our town to build and enjoy. We will not let it be taken over.. TR STRONG!

122.   In February 2016, the Toms River Township Council adopted an ordinance banning real estate solicitation in the areas of North Dover bordering Lakewood Township, after residents complained about Orthodox Jewish families seeking homes in the area.

123.   Township employees have also urged residents to place so-called "No Knock" stickers on their front doors which, under another recently passed Toms River ordinance, prohibits individuals from asking residents if their homes are for sale.

124.    The anti-solicitation and "No Knock" ordinances were motivated by hostility toward the Orthodox Jewish population and a desire to prevent them from moving into Toms River.

125.    Toms River residents have made statements indicating that such efforts were motivated by hostility towards Orthodox Jews, which include:

1)    "The message from the meeting was abundantly and obnoxiously clear: no Jews in Toms River. Instead of it being a mechanism to address homeowners who are being harassed, it's clear Toms River will make it very difficult for the orthodox to buy a home. Tell me, does the no knock sticker have a swastika on it?"

2)    "Jackson, Toms River, Howell and Manchester will look just like Lakewood if you allow the current disease to spread. "

3)    "Toms river will never be the same if this happens .. These people are trying to takeover our state !"

126.    The Township's active participation and encouragement of local residents not to permit members of the Orthodox Jewish community to approach them concerning real estate purchases demonstrates official hostility towards Orthodox Jews.

127.    The Township has been directly responsive to individuals motivated by hostility toward Orthodox Jews.

128.    In response to Ordinance 4508-16, authorizing the acquisition by eminent domain of property under contract by Orthodox Jews, local residents have made comments on social media such as:

1)    "A Good Move to close off any plans of expansion by the jews next door.....
I approve of this Expenditure.....
In an update on the black hats' mission to occupy toms river, Ocean Township (Monmouth county) just shot down the syrian jews' attempt to thwart zoning laws. Those rich dirty jews will now play the race card (just like Lakewood's dirty population doid)"

2)    "Buy the land keep the Jews out they ruined spring valley monsey

22

and Lakewood keep them out"

3)   *"They don't pay property taxes everyone else does especially that area taxes are probably 10 grand or more screw them worship in a synagogue"*

4)   "Unfortunately Jews are not always the best neighbors"

129.   Other anti-Semitic comments posted on online petitions, social media, and news websites concerning Orthodox Jews moving to Toms River include:

130.   "Enough already. They ruined Lakewood now they're out of room and have to INVADE Toms River and soon to be Brick. I already see them riding the rental bikes in Ortley Beach. Surveying for a new host, like parasites. Stinkin cockroaches"

1)   "this so-called religion is an excuse NOT to pay taxes, these people seem to do anything they want and they're spreading like wildfire!!!"

2)   "Real simple...f**k them, we have rights too!!!!"

3)   "When one looks at the current blighted tragedy that has turned the once proud and stately community of Lakewood into a bargain basement slum, and then factors in what the overflow of these subjects are doing in the process of recreating the same in Jackson and Toms River, one learns from simple observation that the countries surrounding Israel do have some legitimate concerns about their neighborhoods. By personal choice and actions, this type of behavior can only be viewed as public parasites feeding off of the societies of the world."

4)   "These douche bags all hide behind religion"

5)   "Okay so what's wrong with being anti Jew if they are bad people? Generally for many years Christians have been extremely tolerant or the way they are treated in Israel and in other Jewish controlled areas. And Christians not directly affected didn't believe the stories and they called those who complained anti-semites even though Arabs are also semites. But most people don't have time to dig too deeply into many of the issues affecting people today and historically. But now the white Christians of Toms River are seeing the reality of Jews at the Grassroots not the reality of Jews who run all the major media, Hollywood, and academic organs ( which is just too far removed from our daily lives even though all those groups spread cultural Marxism which affects us everywhere in everything

we do). Reality is easy to deny when it's far away and when nobody has the courage to criticize it. And those who do take note of it are called names to shut them down. But now reality is trespassing in your backyard and staring at your daughters in their bikinis. Maybe now people will wake up, take notice and be honest and forthright. Virtue is rewarded. Denial leads to destruction."

6)   "'I'*d like to share a revelation that I've had during my time here. It came to me when I tried to classify your* species *and I realized that you're not actually mammals. Every mammal on this planet instinctively develops a natural equilibrium with the surrounding environment but you humans do not.* **You move to an area and you multiply and multiply until every natural resource is consumed and the only way you can survive is to spread to another area. There is another organism on this planet that follows the same pattern. Do you know what it is? A virus.** *Human beings are a disease, a cancer of this planet.*'

(Agent Smith, "The Matrix")

Substitute as appropriate…"

7)   "Lakewood and all the other idiots who accept Jewish aggression deserve everything that's coming to them. You gotta have the guts to speak out. If the Jews are colluding to break the back of the town then it's probably a RICO violation. They're like parasites. They feed off the success created by white Western Christian civilization and promote ideas that are killing it. Many sit around moaning that Muslims and Mexicans and others don't assimilate. Jews don't assimilate either no matter where they go. Because wouldn't assimilation in a Christian civilization mean that you would eventually be Christian? After all what does assimilation mean?"

8)   "Since the Jews run Academia, Hollywood, the universities. And many are attorneys and politicians then I think you are pretty much F'd. But now you understand why every nation who has ever accepted Jews has eventually expelled them. Its just histor. And why so many have complained about Jews for so long . But they've been ignored or called names by those who didn't think that they were directly affected by anything. So now the chickens have come home to roost because you never said anything before now because well it was only happening to other people. Believe me nobody is coming to your rescue. This is a fight you will have to figure out how to deal with"

9)   "This is the smartest preemptive measure Toms River can do. Well done." -Toms River Bans Real Estate Solicitation...

10)  "and the Jews r the problem. **#TomsRiverStrong** #JacksonStrong"

11)  "check out the Jooish situation in NJ **#tomsriverstrong**. They took our jobs...and houses."

12)  "I'll take the non-foreskin chewing corruption over these dirtbags any day."

13)  "The orothodox jews have destroye Lakewood. All propertis are tax exempt because all properties are 'owned' by the Church. Do not permit the "church" to take over Toms River."

14)  "They have ruined Rockland County , NY pulling this same crap, Don't let it happen in Ocean County!!!!!!!"

15)  "I think we all need to get pigs to put on our front lawns, in our back back yards...if you are zoned agricultural, residential & commercial like we are on New Hampshire Ave…get some pigs, that will keep them all away! ;) Say YES to pork! LOL"

16)  "Toms River is where I grew up and I absolutely love it. I do not want to see my home town get destroyed.. Keep the Jews out!

17)  "They have ruined enough towns over here they will not ruin another"

18)  "They are like locusts. They ruin everything they touch. In short order Toms River will be broke, covered in garbage, and infested with bugs and vermin."

19)  "Take a look at Lakewood and every others area they live and breed! They will ruin toms river!"

20)  The Jewish population as is proof in Lakewood destroys a neighborhood.

21)  Enough. Keep them in Lakewood.

22)  Keep THEM in Lakewood!! We don't need THEM taking over or town!!

23)  "I want no part of them in Toms River!"

24)  "Please don't let them destroy another town."

25)  "Toms river will never be the same if this happens .. These people are trying to take over our state !"

26)  "Please stop this nonsense. This offshoot cult of the Jewish faith will destroy this town. Township officials need to stop worrying about

25

being politically correct before Toms River looks like Lakewood."

27) "If I'm labeled racist /AntiSemitic by banding together and doing the right thing, not wanting a parasite to destroy the future of our next generation, then so be it."

28) "Keep these people out of Toms River please! They are dirty and we do not need their Freeloading here. Be smart!"

29) "I wish all of you luck in fighting this losing battle with the Jewish community. As some one on here stated they are coming and no one will stop them. Thank you Toms River Official for destroying the once beautiful Toms River because you are to blame for not doing anything. Its So... So Sad"

30) "So please stop the Hassidic and Jewish communities from entering our town and turning it into another Lakewood."

31) "The Orthodox Jewish community in Lakewood has essentially driven that town into the ground. We don't need them doing that to surrounding areas."

32) "Really how is it possible these people and I mean no disrespect are getting away with this they taken over Lakewood Nj and talk about not liking other cultures they won't even let any other cultures go to their schools or even they won't hirer people of other cultures to work for them"

33) "Keep these damn jews out of Toms River.. There will be issues if this passes... I promise."

34) "No jews in tr"

129.    The 2017 election in Toms River was reported to be "one of the nastiest elections" in recent years with development in Toms River's northern sections dominating the debate, and resulted in a major upset in the Township Council.

130.    A non-binding referendum on the ballot asked residents if Toms River should buy up to 250 acres of property for preservation or potential recreational use. The referendum was approved by an overwhelming margin of 82 to 18 percent.

131.    On January 2, 2018, Councilman George Wittmann suggested that the Township ask the Toms River Municipal Utilities Authority ("TRMUA") to conduct a sewer capacity study

in the North Dover area and to impose a one-year moratorium on new development until the study is finished. Councilman Maurice Hill said that he is amenable to Wittmann's suggestion and that the Township should move aggressively to preserve "open space."

132.    On February 5, 2018, a federal district court judge in the District of New Jersey entered an order against the Defendant Township of Toms River Zoning Board of Adjustment for discriminating against a synagogue. The Order for Judgment states:

> The BOA's decision denying Plaintiffs' appeal of the application to use the subject property as a Chabad house is determined to be a violation of RLUIPA, the Fair Housing Act, 42 U.S.C. § 3604, the Free Exercise Clause of the First amendment and Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

133.    In February 2018, Councilman Daniel Rodrick proposed that Toms River eliminate all zoning for multifamily homes. Councilman Rodrick asked that Township Attorney, Planner and staff draft an ordinance that would eliminate multifamily zones. Councilman Rodrick reportedly stated: "I'm still hopeful we could work together to rectify what many residents identify as a surge of development in Toms River."

134.    In July of 2018, a local resident wrote to Township Councilman Brian Kubiel:

> After reading the article concerning a new synagogue and the 10 acres of land requirement, I was both pleased and disappointed. I'm pleased some of the Council Members are defending the 10 acre land requirement. I'm disappointed that at least one Council Member is looking to revisit the ordinance and create a committee to study the issue.

Mr. Kubiel responded:

> I'm sure you are aware, the township recently lost the Chabad case in Federal court which places the 10 acre ordinance in question. Additionally, the Twp was forced to go pay 125,000 for there legal fees. As a result, I am asking for a committee of three council members, the twp administrator, twp attorney and contracted Federal counsel that specifically deals with the Rluipa laws. The committees charge is to look at all the ordinances and tell us where our twp is vulnerable and what can we do to make them solid. I've lived here since the early 60's and do not

27

<u>want the town to change</u> but on the other hand want to make sure we are on solid ground.

(Emphasis added.)

135.    In July of 2018, the Township met with representatives from the United States Department of Justice ("DOJ") to discuss the Township's legal obligation under RLUIPA.

136.    In August of 2018, the Township retained attorney Marci Hamilton to advise the Township's on zoning issues affecting religious institutions and RLUIPA.

137.    On January 22, 2018, the Township issued a report pursuant to a request by the DOJ, titled Report on Amendments to Land Use Ordinances Governing Houses of Worship ("Report").

138.    The Township's Report details areas in which the Township's zoning code is not in compliance with RLUIPA.

139.    The Township's Report admits that removing houses of worship as a conditional use in the RR zone "may have swept too broadly," and that other conditional uses in the RR zone which include health care facilities, quasi-public and private club recreation areas, administrative offices and research laboratories, and long-term residential health care facilities "are arguably equally or more intensive than churches and places of worship."

140.    The Township's Report also admits that

the RR zone comprises a large swath of land in the northwestern section of the Township where many houses of worship, from various denominations, are already located, near to residential neighborhoods. And finally, this area of the Township is near to or traversed by several highways classified as "major collector[s], [or] minor arterial or principal arterial roadways," frontage on which is one of the key conditional use standards for houses of worship. For these reasons, the environmental and infrastructural impact of houses of worship in the RR zone would be less acute than in the other four low-density residential zones, where houses of worship, and the other types of allowable uses in the RR zone, have a

28

minimal presence.

141.    The Township's Report proposed to re-establish churches and places of worship as conditional uses in this district, stating that "[t]his simple but significant revision honors the Township's obligations under RLUIPA, and the First Amendment, to provide adequate opportunities for religious groups to establish houses of worship."

142.    The Township's Report also acknowledges that "the substantial body of case law interpreting RLUIPA signals to the Township that the 2009 removal of houses of worship from the RR zone may prove problematic under the statute's equal terms provision," and that "certain provisions of the land use code could be regarded as facially suspect."

143.    Despite this proposal, houses of worship remain to this date excluded from the list of conditional uses that are permitted in the RR zone.[3]

144.    The Township's Report also states that the DOJ official expressed concern that the Township's 10-acre minimum lot size requirement for houses of worship in zones where houses of worship were permitted as a conditional use was too restrictive and may have been selected without sufficient analysis.

145.    In response to the DOJ's concerns, the Report suggested lowering the minimum lot size requirement to "mitigate[]" the DOJ's concerns.

146.    To date, the Township has not lowered the minimum lot size requirement for houses of worship.[4]

147.    In 2019, Maurice Hill, former Councilmember and current mayor of Toms River stated in response to an email from a local resident:

> I have been proactive in preserving our quality of life in Toms River.

---

[3] Pursuant to Ordinance 4700-21, houses of worship are now a conditional use in the RR zone.
[4] Ordinance 4700-21 lowered the minimum lot size to two (2) acres for houses of worship.

> While on the Council we have preserved over 400 acres of open space and most recently preserved Guttman, Boynton and Huppert Farms along with the Cox Cro Horse Farm. These were properties that I had researched and asked our Land Use Committee (LUC) to approve for purchase and condemnation if necessary. I was on the LUC and Council when we drafted the 10 acre house of worship ordinance in the northern section of town as we are in a CAFRA region which means you can only have 30% impervious coverage (that includes buildings, parking lots and sidewalks and curbs). 10 acres would allow a community to build their house of worship on 3 acres. St. Luke's Roman Catholic Church is on 20.2 acres yet because of CAFRA they cannot build anything else on the site. I have asked our legal department for an opinion on the issue you have raised. As an elected official who is not an attorney I have to adhere to their advice. We are currently under a DOJ investigation of our zoning laws. I appreciate your support and hope that you can support me in this election and understand that while we are under DOJ investigation I must follow the legal recommendations of our legal staff.

148.    In 2019, Maurice Hill also stated in reference to a sample ordinance for 2-acre "small houses of worship" on the Land Use Agenda, "I felt blindsided and had the ordinance pulled from the agenda."

149.    In February 2020, a local resident stated in an email to Maurice Hill, "I sat in a small setting with you not more than 10 ft. away and you looked me straight in the eye and said there is nothing you can do to stop the Orthodox Jewish Community from buying in Toms River which I wholeheartedly agreed with but you were going to keep the acreage requirement of 10 acres for a House of Worship."

150.    In a letter dated September 17, 2020, the United States Department of Justice ("DOJ") informed the Township that they had completed its investigation of the zoning and land use practices of Toms River under RLUIPA, and that the Assistant Attorney General for the Civil Rights Division authorized the filing of a complaint in federal district court against the Township, alleging

> that the Township's zoning laws unreasonably limit religious exercise, treat religious assemblies or institutions on less than equal terms with

nonreligious assemblies or institutions and substantially burden religious exercise, which burden does not further a compelling government interest and is not the least restrictive means of furthering a compelling government interest.

151.    In its September 17, 2020 letter, the DOJ stated that they are willing to enter into pre-suit negotiations in an effort to resolve this matter, but that a resolution must, at a minimum, involve "significant changes" to the Township's zoning ordinance "that address the religious needs of Orthodox Jews." The DOJ also stated that "revising the Township's zoning ordinance such that houses of worship require parcels with seven or more acres, as proposed in the Township's "Report on Amendments to Land Use Ordinances Governing Houses of Worship," is insufficient to remedy the Township's violations of RLUIPA."

152.    On March 10, 2021, the DOJ filed a Complaint ("DOJ Complaint"), Case 3:21-cv-04633 (ECF No. 1) in this Court challenging the Township's land use regulations governing houses of worship. The DOJ Complaint states in part:

> The United States brings this civil action against the Township of Toms River ("Toms River" or "Township") under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.*, stemming from the Defendant's enactment and application of its Land Use and Development Regulations ("Land Use Regulations") beginning in 2009 that impose unreasonable limits on places to worship within the Township, treat religious assemblies and institutions less favorably than nonreligious assemblies and institutions, and impose a substantial burden on the exercise religion on religious communities, including the Orthodox Jewish community. The result of these zoning restrictions is that there is essentially nowhere in the Township for new congregations to develop a house of worship.

153.    The DOJ Complaint also alleges, *inter alia*, the following:

A.  "The arrival of Orthodox Jews to Toms River has been met with resistance from local residents and politicians."

B.  "Orthodox Jews in Toms River have been the target of harassment and intimidation. For example, Orthodox Jews, wearing black hats and coats—traditional clothing worn by many Orthodox Jewish males—

have been verbally assaulted while walking down the street by passing motorists yelling anti-Semitic slurs and comments."

C. "Ordinance 4558-17 drastically limited where potential houses of worship could locate, reducing the number of parcels where houses of worship were allowed as a conditional use from approximately 180 to 74 parcels (a reduction of approximately 60%)."

D. "The Township's post-2009 Ordinances prevent Orthodox Jews from constructing, establishing, or otherwise operating Orthodox houses of worship in Toms River."

154.    On March 10, 2021, the DOJ and the Township jointly submitted a proposed Consent Order, Case 3:21-cv-04633 (ECF No. 2), which was entered by the Court on March 11, 2021, Case 3:21-cv-04633 (ECF No. 4) ("Consent Order").

155.    In the Consent Order, the DOJ and the Township stipulated, *inter alia*, that

13. Between March 2009 and October 2017, the Township amended its Land Use Regulations to significantly reduce the number of parcels eligible for houses of worship by reducing the number of zoning districts where houses of worship are allowed . . . , and by significantly increasing the minimum acreage size—from two to ten acres—required to develop a house of worship. These post-2009 amendments to the Land Use Regulations have significantly reduced both the number of parcels and acreage of parcels where houses of worship are allowed as of right or conditionally.

14. The post-2009 amendments also eliminated houses of worship as a conditional use in many of the residential zoning districts located in the northern area of the Township where population growth, including the growth of the Orthodox Jewish population, and thus potential demand for new houses of worship, is most likely.

15. The cumulative effect of these amendments has been to reduce significantly both the number of zoning districts in which houses of worship may locate and the number of sites available for houses of worship within the remaining districts where they may lawfully locate.

16. Since 2009, no new house of worship has been formally established in any as of right or conditionally allowed zoning district in Toms River.

17. These amendments especially impact options for Orthodox Jewish residents to establish Orthodox Jewish houses of worship within walking distance from their homes, as required by their religious beliefs, and

whose houses of worship are generally small and do not require significant acreage.

156.    In the Consent Order, the DOJ and Township also stipulated that "[t]he Township's Land Use Regulations further restrict houses of worship from operating on equal terms with nonreligious assemblies and institutions."

157.    Pursuant to paragraph 29 of the Consent Order, the Township is enjoined from

a. Imposing or implementing a land use regulation in a manner that unreasonably limits religious assemblies, institutions, or structures within a jurisdiction;

b. Imposing or implementing a land use regulation in a manner that treats a religious assembly or institution on less than equal terms than a nonreligious assembly or institution;

c. Imposing or implementing a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, that is not pursuant to a compelling governmental interest pursued in the least restrictive means;

d. Otherwise engaging in any conduct that violates RLUIPA; or

e. Coercing, intimidating, threatening, interfering with, or retaliating against any person in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by RLUIPA.

158.    Paragraph 32 of the Consent Order states, "[t]o comply with RLUIPA's provisions, the Township may grant waivers, accommodations, or adjustments to the requirements of its Land Use Regulation to avoid imposing a substantial burden on the exercise of religion."

159.    The Consent Order required the Township to amend its Land Use Regulations to comply with RLUIPA and satisfy certain requirements in Appendix A including the following:

The Township may allow houses of worship by right or as a conditional use, or may prohibit their use, and may impose minimum lot sizes requirements, minimum lot widths, impervious coverage limits, roadway frontages requirements, and other development criteria on houses of worship in the Township's zoning districts other than the Conditionally Allowed Zoning Districts or Permitted As of Right Zoning Districts,

33

provided that the use and minimum lot size requirements, minimum lot widths, impervious coverage limits, roadway frontage requirements, and other development criteria imposed on houses of worship in these other zoning districts are consistent with and on terms that are not less equal than the use and minimum lot size requirements, minimum lot widths, impervious coverage limits, roadway frontage requirements, and other development criteria imposed on nonreligious assemblies or institutions, such as clubs, commercial recreation areas, dancing and other instructional schools, funeral homes, administrative facilities, community centers, meeting halls, schools, colleges, universities, theaters, and daycares in those zoning districts.

(Emphasis added.)

160.    On July 13, 2021, the Township enacted Ordinance 4700-21, which amended various zoning provisions in its Code.

161.    Despite its obligations under federal law and the Consent Order, the Township amended various zoning requirements in a manner that continues to discriminate against "Churches and places of worship," and against the Orthodox Jewish population.

162.    Various provisions of the Township's amendments violate the Court's Consent Order.

163.    Prior to the enactment of Ordinance 4700-21, section 348.8-20 of the Code, which sets forth requirements for off-street parking, set forth the following requirement for "Churches and places of worship":

one parking space for each three seats in the main congregation seating area.  Where no individual seats are provided, 20 inches of bench shall be considered as one seat.  Where seats or benches are not provided, or are provided only in a portion of the main congregation seating area, there shall be one parking space for each 50 square feet of floor area within the main congregation seating area.

164.    With the enactment of Ordinance 4700-21, the parking requirement for "Churches and places of worship" was changed to require "one parking space for each 100 square feet of gross floor area."

165.    By calculating parking requirements based on gross floor area instead of on the number of seats in the main sanctuary, the new parking requirement is extremely burdensome for Orthodox Jewish congregations, diverges sharply from requirements that are customarily applied to houses of worship, treats religious assemblies and institutions on less than equal terms as nonreligious assemblies or institution, unreasonably limits religious assemblies and institutions in Toms River, and makes it virtually impossible for new Orthodox Jewish houses of worship to locate in the Township.

166.    In Orthodox Jewish *shuls*, when the main sanctuary is in use, other parts of the building, such as a required social hall, are not in use.

167.    By calculating parking based on the size of the entire building instead of the sanctuary space, Orthodox Jewish *shuls* are specifically placed at a disadvantage.

168.    This new parking ordinance is especially punishing for Orthodox Jewish *shuls,* as congregants walk to *shul* on the Sabbath and holidays and do not drive, as driving is prohibited on the Sabbath and other Holy Days by Jewish law.  Upon information and belief, the new parking ordinance was targeted at Orthodox Jewish synagogues.

169.    Under the old Code provision for parking, Bais Brucha would have been required to have 38 parking spaces for its proposed *shul*, based on the proposed 112 seats in the main sanctuary.  Under the new Code provision, Bais Brucha would be required to have 133 parking spaces, based on the proposed gross area of 13,235 square feet.

170.    Bais Brucha's proposed synagogue met the requirements of the prior parking ordinance.

171.    Bais Brucha's proposed synagogue cannot meet the requirements of the new parking ordinance.

172.    No other part of Bais Brucha's proposed *shul* will be used at the same time the

main sanctuary is used, except for restrooms; yet, under the new ordinance Bais Brucha is required to provide parking spaces for all areas of the building, including those that are not in use when the congregation is in the main sanctuary for prayer services.

173.   Such a requirement unreasonably regulates "Churches and places of worship" in Toms River.

174.   The new parking ordinance requires Bais Brucha to have *133* parking spaces on its property which is greater than the number of people attending religious services each week, and even greater than the number of seats in its sanctuary.

175.   Most of Bais Brucha's congregants will walk to *shul* during Sabbath and holiday services.

176.   The Township's new parking requirements for "Churches and places of worship" treat religious assembly and institutional land uses on less than equal terms as nonreligious assembly and institutional land uses.

177.   While "Churches and places of worship" must now have one parking space for every 100 square feet of gross floor area, the following uses were treated more favorably under Ordinance #4700-21 than houses of worship:

    A.  Community center, library, museum, art gallery: one parking space for each 300 square feet of gross floor area.

    B.  Theater: one parking space for each three seats.

    C.  Hospital (general, mental, sanatorium): one parking space for each two beds based on its licensed capacity.

    D.  Nursery schools, day camps, adult or child-care centers, day nurseries or similar uses: one parking space for each 500 square feet of gross floor area, except as otherwise provided for in N.J.S.A. 40:55D-66.5a through 40:55D-66.7a.

    E.  Government office: to be determined by the Planning Board, except that governmental offices within privately owned buildings shall

provide a minimum of one parking space for each 250 square feet of gross floor area.

F.  Studio (art, music, dance, gymnastics and similar for the purpose of giving instruction rather than shows or exhibitions): one parking space for each 200 square feet of gross floor area.

G.  Continuing-care retirement community, health care and long-term residential health care facilities: one space per independent living unit and one space per six health care beds, and one space per 10 independent living units for visitor parking.

H.  Schools:

(a) Elementary: one parking space for each eight students based on design capacity.

(b) Middle or junior high school: one space for each five students based on design capacity.

(c) High school: one space for each three students based on design capacity.

(d) College or university: one space for each 1 1/2 students based on design capacity.

I.  Convalescent home, nursing home, rest home: one parking space for each two beds based on its licensed bed capacity.

J.  Gymnasiums, fitness facilities and similar physical training facilities: the greater of: a) one per two exercise machines, one per game court, one per 50 square feet of open exercise area; or b) one space per 200 square feet of gross floor area.

K.  Veterinary clinics or hospitals or animal care facilities: one parking space for each 400 square feet of gross floor area.

L.  Banks, savings and loan associations and similar financial institutions: one parking space for each 300 square feet of gross floor area.

M.  Barber and beauty shop: three parking spaces for each chair (if known), but not less than one parking space per 200 square feet of gross floor area.

N.  Bowling alley: four parking spaces for each alley. Other commercial uses within the same building will be computed separately in accordance with this section.

O.  Business offices: one parking space for each 250 square feet of gross floor area.

P.  Farmers' market, auction market: one parking space for each 1,000 square feet of land area in the site.

Q.  Restaurant, cafe or diner providing seating for more than 12 patrons: one parking space for each three seats.

R.  Hotel, motel: one parking space for each rental unit.

S.  Professional office: one parking space for each 250 square feet of gross floor area.

T.  Retail stores, except as otherwise specified: on parking space for each 225 square feet of gross floor area.

U.  Shopping centers: four parking spaces for each 1,000 square feet of gross floor area for centers having less than 400,000 square feet. Shopping centers having 400,000 square feet or more shall provide parking at the rate of 4.5 spaces for each 1,000 square feet of gross floor area. If more than 5% of the enclosed gross floor area of any shopping center is occupied by malls, lobbies, corridors, heating plants or other space not utilized for direct commercial purposes which, in the opinion of the Planning Board, will not generate a need for parking, the Planning Board shall allow the parking required to be based on the gross leasable area of the shopping center at the above rate.

178.   The parking requirement in Ordinance #4700-21 treats "Churches and places of worship" on less than equal terms with non religious assemblies and institutions in violation of paragraph 29(b) of the Consent Order.

179.   The new parking ordinance unreasonably limits religious assemblies, institutions, and structures in violation of the Consent Order, paragraph 29(a), as it is virtually impossible for a new house of worship to practicably comply with the new parking ordinance in the areas of Toms River in which Orthodox Jews reside.

180.   In enacting this new parking ordinance, the Township refocused its efforts against the Orthodox Jewish community and found another means by which to exclude Orthodox Jewish houses of worship from the Township.

38

181.    Despite the Township's obligations under the Consent Order, other provisions of the Code also continue to treat "Churches and places of worship" on less than equal terms as other institutional and assembly uses.

182.    Under the revised Code, "Churches and places of worship" are permitted as a conditional use in those zoning districts specified, subject to the following standards:

A.  The minimum lot area shall be two acres.

B.  The minimum lot width shall be 300 feet on lots of more than four acres and 200 feet for lots of four acres or less.

C.  No principal building shall be located closer than 50 feet to any side or rear property line.

D.  No accessory building shall be located closer than 30 feet to any side or rear residential property line.

E.  Maximum lot building coverage shall be 15%.

F.  On lots of more than four acres, maximum impervious coverage shall be 40%. On lots of four acres or less with fewer than 50 parking spaces and more than 150 feet from beaches, dunes or the mean high-water line of tidal waters, maximum impervious coverage shall be 50%, unless the New Jersey Department of Environmental Protection determines, in writing, that a permit is required under the Coastal Area Facility Review Act (CAFRA) for impervious coverage limits at or below these thresholds. (footnote omitted)

G.  The height of structures to be constructed may exceed the maximum height requirements of this chapter; provided, however, that the front, rear and side yard requirements set forth above shall be increased by two feet for each foot by which the height of the structure exceeds the maximum height which would otherwise be permitted by the chapter, and further provided that in no case shall any proposed structure exceed 50 feet in height.

H.  Churches and houses of worship with a lot size greater than 2.5 acres must front on a street classified as a major collector, minor arterial, or principal arterial roadway. Churches and houses of worship with a lot size of not less than two and not more than 2.5 acres must front on a minor collector, major collector, minor arterial, or principal arterial roadway. Churches and houses of worship, regardless of lot size, may not locate on a roadway classified as a local collector or local street. For the purposes of this exclusion, Maine Street, Shenandoah Boulevard, and Indian Hill Road

39

are regarded as local streets.

183.    Unlike "Churches and places of worship," the following nonreligious assembly and institutional land uses do not have any conditional use requirements in the Code: health care facilities (Code § 348-9.8), shopping centers (Code § 348-9.16), commercial recreation activities (Code § 348-9.19), community shelters for victims of domestic violence (Code § 348-9.28), and long-term residential health care facilities (Code § 348-9.29).

184.    For "Churches and places of worship," the maximum lot building coverage is now 15%, while other nonreligious assembly and institutional land uses continue to have less restrictive maximum lot building requirements.  Current maximum lot building coverage for other uses includes:

A.   Quasi-public and private club recreation areas: 20%.  Code § 348-9.18.

B.   Hotels and motels:  No maximum.  Code § 348-9.15.

C.   Farmers' markets or auction markets:  20%.  Code § 348-9.20.

D.   Continuing-care retirement communities:  20%.  Code § 348-9.27.

E.   Veterinary clinics, hospitals and animal care facilities:  No maximum. Code § 348-9.17.

F.   Retail and office uses:  No maximum.  Code § 348-9.21.

G.   Health care facilities:  No maximum.  Code § 348-9.8.

H.   Shopping centers:  No maximum.  Code § 348-9.16.

I.   Commercial recreation activities:  No maximum.  Code § 348-9.19.

J.   Community shelters for victims of domestic violence:  No maximum. Code § 348-9.28.

K.   Long-term residential health care facilities: No maximum.   Code § 348-9.29

185.    The minimum lot width for "Churches and places of worship" is now 300 feet on lots of more than four acres and 200 feet for lots of four acres or less, while other uses continue to

have less restrictive lot width requirements.  Current minimum lot width requirements for other nonreligious assembly and institutional land uses include:

    A.  Private schools:  None.  Code § 348-9.4

    B.  Farmers' markets or auction markets:  None.  Code § 348-9.20.

    C.  Retail and office uses:  None.  Code § 348-9.21.

    D.  Bed and breakfast establishments:  None.  Code § 348-9.30.

    E.  Health care facilities:  None.  Code § 348-9.8.

    F.  Shopping centers:  None.  Code § 348-9.16.

    G.  Commercial recreation activities:  None.  Code § 348-9.19.

    H.  Community shelters for victims of domestic violence:  None.  Code § 348-9.28.

    I.  Long-term residential health care facilities:  None.  Code § 348-9.29.

186.   With respect to impervious coverage, the new requirements for "Churches and places of worship" are:

> [o]n lots of more than four acres, maximum impervious coverage shall be 40%. On lots of four acres or less with fewer than 50 parking spaces and more than 150 feet from beaches, dunes or the mean high-water line of tidal waters, maximum impervious coverage shall be 50%, unless the New Jersey Department of Environmental Protection determines, in writing, that a permit is required under the Coastal Area Facilities Review Act (CAFRA) for impervious coverage limits at or below these thresholds.

187.   Other nonreligious assembly and institutional land uses continue to have less restrictive impervious coverage requirements than "Churches and places of worship," including:

    A.  Farmers' markets or auction markets:  No impervious coverage limitation.  Code § 348-9.20.

    B.  Administrative offices and research laboratories:  80%.  Code § 348-9.22.

    C.  Retail and office uses:  No impervious coverage limitation.  Code § 348-9.21.

    D.  Boarding houses and rooming houses:  No impervious coverage

limitation.  Code § 348-9.13.

 E. Bed and breakfast establishments: No impervious coverage limitation. Code § 348-9.30.

 F. Health care facilities:  No impervious coverage limitation.  Code § 348-9.8.

 G. Shopping centers:  No impervious coverage limitation.  Code § 348-9.16.

 H. Commercial recreation activities:  No impervious coverage limitation. Code § 348-9.19.

 I. Community shelters for victims of domestic violence:  No impervious coverage limitation.  Code § 348-9.28.

 J. Long-term residential health care facilities:  No impervious coverage limitation.  Code § 348-9.29.

188. The minimum lot area for "Churches and places of worship" is now two acres, while other uses continue to have less restrictive lot area requirements.  Current minimum lot area requirements for other nonreligious assembly and institutional land uses include:

 A. Retail and office uses:  None.  Code § 348-9.21.

 B. Boatyards and/or marinas:  None.  Code § 348-9.10.

 C. Boarding houses and rooming houses:  None.  Code § 348-9.13.

 D. Health care facilities:  None.  Code § 348-9.8.

 E. Shopping centers:  None.  Code § 348-9.16.

 F. Commercial recreation activities:  None.  Code § 348-9.19.

 G. Community shelters for victims of domestic violence:  None.  Code § 348-9.28.

 H. Long-term residential health care facilities:  None.  Code § 348-9.29.

189. "Churches and places of worship" are subject to more onerous height requirements than other uses.  For houses of worship,

   the height of structures to be constructed may exceed the maximum height requirements of this chapter; provided, however, that the front, rear and side yard requirements set forth above shall be increased by two feet for

42

each foot by which the height of the structure exceeds the maximum height which would otherwise be permitted by the chapter, and further provided that in no case shall any proposed structure exceed 50 feet in height.

190.    Nonreligious assembly and/or institutional land uses that are treated more favorably than "Churches and places of worship" with respect to height requirements include:

A.  Nursery schools and day nurseries:  No height requirement.  Code § 348-9.7.

B.  Quasi-public and private club recreation areas:  No height requirement.  Code § 348-9.18.

C.  Farmers' markets or auction markets:  No height requirement. Code § 348-9.20.

D.  Veterinary clinics, hospitals and animal care facilities:  No height requirement.  Code § 348-9.17.

E.  Retail and office uses:  No height requirement.  Code § 348-9.21.

F.  Private schools: "The height of the structure shall not exceed the maximum height permitted in the zone in which the structure will be built pursuant to § 348-5.12." Code § 348-9.4.

G.  Bed-and-breakfast establishments:  No height requirement.  Code § 348-9.30.

H.  Health care facilities:  No height requirement.  Code § 348-9.8.

I.  Shopping centers:  No height requirement.  Code § 348-9.16.

J.  Commercial recreation activities:  No height requirement.  Code § 348-9.19.

K.  Community shelters for victims of domestic violence:  No height requirement.  Code § 348-9.28.

L.  Long-term residential health care facilities:  No height requirement.  Code § 348-9.29.

191.    For "Churches and places of worship," no principal building shall be located closer than 50 feet to any side or rear property line.  Other nonreligious assembly and institutional land uses require less than 50 feet to the side or rear property lines including:

43

    A.  Retail and office uses:  No such requirement.  Code § 348-9.21.

    B.  Health care facilities:  No such requirement.  Code § 348-9.8.

    C.  Shopping centers:  No such requirement.  Code § 348-9.16.

    D.  Commercial recreation activities:  No such requirement.  Code § 348-9.19.

    E.  Community shelters for victims of domestic violence:  No such requirement.  Code § 348-9.28.

    F.  Long-term residential health care facilities:  No such requirement.  Code § 348-9.29.

192.    For "Churches and places of worship," no accessory building shall be located closer than 30 feet to any side or rear residential property line.

193.    Other nonreligious assembly and institutional land uses require less than 30 feet to the side or rear property lines, including:

    A.  Retail and office uses:  No such requirement.  Code § 348-9.21.

    B.  Hotels and motels:  20 foot requirement.  Code § 348-9.15.

    C.  Health care facilities:  No such requirement.  Code § 348-9.8.

    D.  Shopping centers:  No such requirement.  Code § 348-9.16.

    E.  Commercial recreation activities:  No such requirement.  Code § 348-9.19.

    F.  Community shelters for victims of domestic violence:  No such requirement.  Code § 348-9.28.

    G.  Long-term residential health care facilities:  No such requirement.  Code § 348-9.29.

194.    "Churches and places of worship" are subject to the following requirement:

Churches and houses of worship with a lot size greater than 2.5 acres must front on a street classified as a major collector, minor arterial, or principal arterial roadway. Churches and houses of worship with a lot size of not less than 2 and not more than 2.5 acres must front on a minor collector, major collector, minor arterial, or principal arterial roadway. Churches and houses of worship, regardless of lot size, may not locate on a roadway classified as a local collector or local street. For the purposes of this

exclusion, Maine Street, Shenandoah Boulevard, and Indian Hill Road are regarded as local streets.

195.   The requirement for "Churches and places of worship" to locate on certain classifications of roadways does not exist for certain other nonreligious assembly and/or institutional land uses, including:

A. Retail and office uses:  No comparable requirement.  Code § 348-9.21.

B. Private and parochial schools:  No comparable requirement.  Code § 348-9.4.

C. Bed-and-breakfast establishments:  No comparable requirement.  Code § 348-9.30.

D. Health care facilities:  No comparable requirement.  Code § 348-9.8.

E. Shopping centers:  No comparable requirement.  Code § 348-9.16.

F. Commercial recreation activities:  No comparable requirement.  Code § 348-9.19.

G. Community shelters for victims of domestic violence:  No comparable requirement.  Code § 348-9.28.

H. Long-term residential health care facilities:  No comparable requirement.  Code § 348-9.29.

196.   Despite the Consent Order and the Township's recent amendments to the Code, the Code continues to discriminate against religious land uses on its face, in favor of various nonreligious assembly and institutional uses.

197.   On April 8, 2022, Plaintiffs filed a Motion for Leave to file an Amended Complaint adding new allegations related to the DOJ Complaint, Consent Order, Ordinance 4700-21 and additional discrimination against houses of worship by the Township.

198.   On April 19, 2022, the DOJ submitted a letter, by e-mail, to Anthony Merlino, Assistant Township Attorney stating, in relevant part:

It has come to our attention that when the Township of Toms River ("Township") revised its zoning code in July 2021 (the "revised zoning

45

code"), it may have done so in a manner that is inconsistent with Appendix A of the Consent Order. Specifically, the Township's revised zoning code changed the off-street parking requirement for a house of worship from one parking space per three seats to one parking spot per 100 square feet of gross floor area, *see* Township Code § 348-8.20(O)(14), while the parking requirements for comparable nonreligious assemblies and institutions remained at less burdensome levels. Specifically, the parking requirement for a theater remained at one parking space for each three seats, id. § 348-8.20(O)(10), and the parking requirement for a daycare remained at one parking spot per 500 square feet of gross floor area, id. § 348-20(O)(29).

We recognize that the zoning code revisions that the Township enacted in July 2021 (and for which we provided comments) established the same parking requirements for "[m]eeting rooms, place of worship, assembly or exhibition hall." However, as stated in Appendix A, the Consent Order requires that the Township may not impose development criteria on houses of worship that are "less equal than" the criteria imposed on nonreligious  institutions or assemblies such as community centers, theaters and daycares. Under the revised zoning code, a house of worship is now  required to have as much as five times as many parking spaces as one  of the  enumerated  comparable  secular  places  of  assembly. Accordingly, we  believe that the Township's revised zoning code may not be in compliance with the Consent Order.

199.    On April 27, 2022, the DOJ submitted a Statement of Interest letter in this action

(ECF No. 33) stating, in pertinent part:

The zoning amendments contained in [Ordinance 4700-21] are not, as the Township writes, "judicially-approved." The Township enacted Ordinance 4700-21 in July 2021, several months after entry of the Consent Order. The Consent Order bars the Township from imposing development criteria on houses of worship that are unequal to the requirements imposed on nonreligious assemblies. See Consent Order, § 30, Appendix A. On April 19, 2022, the day after the Township filed its opposition to the pending motion in Bais Brucha, the United States notified the Township by letter that the Township's revised off-street parking requirements may violate the Consent Order by imposing more burdensome requirements on religious institutions than on nonreligious ones.

If the United States concludes that the revised ordinance fails to comply with the Consent Order, we will adhere to the process set forth in the Consent Order, which first contemplates an effort to resolve any disputes informally prior to seeking relief from the Court.

200.    As a result of the DOJ Statement of Interest and representations by the Township

that they would amend their Code to address the DOJ's concerns, the Court administratively terminated Plaintiffs' Motion for Leave to file an Amended Complaint on May 5, 2022.

201.   On June 8, 2022, the Township introduced Ordinance 4752-22, amending Section 8.20, subsections "I" and "O" of Chapter 348 of the Township Code regulating parking for places of worship and off-tract parking for nonresidential uses, and amending section 8.26, subsection "G" of the Township Code regulating ground signs.

202.   On July 13, 2022, Ordinance 4752-22 was passed by the Township Council.

203.   Ordinance 4752-22 did not change the parking requirement for places of worship, but instead changed the parking requirements for some other nonreligious land uses to make the requirements on those other uses as burdensome as the requirements are for places of worship. The amended Code now requires, in addition to "places of worship," certain nonreligious uses to have one parking space for each 100 square feet of gross floor area.  These uses include:

    A.  Meeting room. Code § 348-8.20.

    B.  Assembly or exhibition hall. Code § 348-8.20.

    C.  Community center. Code § 348-8.20.

    D.  Library. Code § 348-8.20.

    E.  Museum. Code § 348-8.20.

    F.  Art gallery. Code § 348-8.20.

    G.  Community club. Code § 348-8.20.

    H.  Private club. Code § 348-8.20.

    I.  Lodge. Code § 348-8.20.

    J.  Theater. Code § 348-8.20.

    K.  Nursery schools. Code § 348-8.20.

    L.  Day camps. Code § 348-8.20.

M. Adult or child care centers. Code § 348-8.20.

N. Day nurseries. Code § 348-8.20.

204.   Prior to the passage of Ordinance 4752-22, the restrictions on certain nonreligious uses were far less onerous.  The previous requirements for these uses are as follows:

A. Community center.  Code § 348-8.20: one parking space for each 300 square feet of gross floor area.

B. Library.  Code § 348-8.20: one parking space for each 300 square feet of gross floor area.

C. Museum.  Code § 348-8.20: one parking space for each 300 square feet of gross floor area.

D. Art gallery.  Code § 348-8.20: one parking space for each 300 square feet of gross floor area.

E. Theater. Code § 348-8.20: one parking space for each three seats. In a shopping center, one for each four seats.

F. Nursery schools. Code § 348-8.20: one parking space for each 500 square feet of gross floor area, except as otherwise provided for in N.J.S.A. 40:55D-66.5a through 40:55D-66.7a.

G. Day camps. Code § 348-8.20; one parking space for each 500 square feet of gross floor area, except as otherwise provided for in N.J.S.A. 40:55D-66.5a through 40:55D-66.7a.

H. Adult or child care centers. Code § 348-8.20: one parking space for each 500 square feet of gross floor area, except as otherwise provided for in N.J.S.A. 40:55D-66.5a through 40:55D-66.7a.

I. Day nurseries. Code § 348-8.20: one parking space for each 500 square feet of gross floor area, except as otherwise provided for in N.J.S.A. 40:55D-66.5a through 40:55D-66.7a.

205.   Following the passage of Ordinance 4752-22, the Township's Code continues to favor other nonreligious assembly and institutional land uses with respect to parking requirements. These uses include, but are not limited to:

A. Banks, savings and loan associations and similar financial institutions. Code § 348-8.20: one parking space for each 300 square feet of gross floor area.

B.   Barber and beauty shops. Code § 348-8.20: three parking spaces for each chair (if known), but not less than one parking space per 200 square feet of gross floor area.

C.   Bowling alleys. Code § 348-8.20: four parking spaces for each alley.

D.   Business offices. Code § 348-8.20: one parking space for each 250 square feet of gross floor area.

E.   Convalescent homes, nursing homes, and rest homes. Code § 348-8.20: one parking space for each two beds based on its licensed bed capacity.

F.   Convenience stores and similar self-service food markets. Code § 348-8.20: one parking space for each 175 square feet of gross floor area.

G.   Dental and medical professional offices. Code § 348-8.20: one parking space for each 150 square feet of gross floor area.

H.   Drive-in restaurant. Code § 348-8.20: one parking space for each 30 square feet of gross floor area.

I.   Driving ranges and miniature golf. Code § 348-8.20: one parking space for each tee or hole.

J.   Farmers' and auction markets. Code § 348-8.20: one parking space for each 1,000 square feet of land area in the site.

K.   Furniture and appliance stores or similar types of uses requiring large amongst of storage. Code § 348-8.20: one parking space for each 400 square feet up to 4,000 square feet, plus one parking space for each 800 square feet of gross floor area above 4,000 square feet.

L.   Government offices. Code § 348-8.20: to be determined by the Planning Board, except that governmental offices within privately owned buildings shall provide a minimum of one parking space for each 250 square feet of gross floor area.

M.   Hardware and auto supply stores. Code § 348-8.20: one parking space for each 250 square feet of gross floor area.

N.   Hospitals. Code § 348-8.20: one parking space for each two beds based on its licensed capacity.

O.   Hotels and motels. Code § 348-8.20: one parking space for each rental unit. Each commercial use within the building shall be computed separately according to the requirements for such use set forth herein. The Planning Board may allow up to 50% of the required parking for commercial uses in the hotel or motel to be satisfied by guest room

parking.

P.  Laundromats or similar coin-operated cleaning. Code § 348-8.20: one parking space for each 200 square feet of gross floor area.

Q.  Professional offices. Code § 348-8.20: one parking space for each 250 square feet of gross floor area.

R.  Retail stores. Code § 348-8.20: one parking space for each 225 square feet of gross floor area.

S.  Studios such as art, music, dance, gymnastics and similar for the purpose of giving instruction rather than shows or exhibitions. Code § 348-8.20: one parking space for each 200 square feet of gross floor area.

T.  Schools. Code § 348-8.20: such as elementary: one parking space for each eight students based on design capacity; middle or junior high school: one space for each five students based on design capacity; high school: one space for each three students based on design capacity; college or university: one space for each 1 ½ students based on design capacity.

U.  Shopping centers. Code § 348-8.20: four parking spaces for each 1,000 square feet of gross floor area for centers having less than 400,000 square feet and shopping centers having 400,000 square feet or more shall provide parking at the rate of 4.5 spaces for each 1,000 square feet of gross floor area.

V.  Veterinary clinics or hospitals or animal care facilities. Code § 348-8.20: one parking space for each 400 square feet of gross floor area.

W.  Continuing-care retirement communities, health care and long-term residential health care facilities. Code § 348-8.20: one parking space per independent living unit and one space per six health care beds, and one space per 10 independent living units for visitor parking.

X.  Gymnasiums, fitness facilities and similar physical training facilities. Code § 348-8.20: the greater of one per two exercise machines, one per game court, one per 50 square feet of open exercise area or one space per 200 square feet of gross floor area.

206.  Despite the warnings from the Department of Justice, the Township refused to alleviate the burden on places of worship imposed by its new targeted parking regulation. Instead, the Township maintained that burden on places of worship by imposing similar parking

requirements for certain other (but not all) nonreligious assembly and institutional land uses in order to continue preventing synagogues from locating in the Township.

207.   The Towship's new parking requirements for places of worship diverge sharply from customary standards for parking requirements for places of worship.

208.   The Township's new parking requirements for places of worship highlight the Townships's purposeful discimination, especially where the recognized need for Orthodox Jewish synagogues demonstrates that excessive parking is unnecessary when those congregants do not even drive to synagogues on the Sabbath and Holy Days.

209.   The Township continues to this day to discriminate against places of worship and against Bais Brucha by imposing its targeted, burdensome and unreasonable parking requirements on houses of worship.

210.   The new parking ordinance continues to this day to unreasonably limit religious assemblies, institutions, and structures in violation of the Consent Order, paragraph 29(a), as it is virtually impossible for a new house of worship to practicably comply with the new parking ordinance in the areas of Toms River in which Orthodox Jews reside.

211.   In enacting this new parking ordinance, the Township continues to purposefully exclude Orthodox Jewish houses of worship from the Township.

212.   "Churches and places of worship" are similarly situated to the nonreligious assembly and institutional land uses listed above with respect to any regulatory purposes.

213.   The Township's amendments to its Code have not eliminated these deficiencies.

214.   The Township has treated Plaintiffs' religious land use on less than equal terms as other nonreligious institutional and assembly uses.

215.   The Township treats houses of worship on less than equal terms with other

nonreligious institutional and assembly uses.

216.    The Defendants' actions described above all took place under color of state law.

217.    The Defendants are "government[s]" under 42 U.S.C. § 2000cc-5(4).

218.    Plaintiff Bais Brucha is a religious assembly or institution, as that term is used in 42 U.S.C. § 2000cc(b)(1).

219.    The Township Code sections described above are "land use regulations" under 42 U.S.C. § 2000cc-5(5).

220.    Plaintiffs have suffered significant damages as a result of the Defendants' actions.

221.    The Township possesses no compelling interest that justifies exclusion of Plaintiffs' religious land use.

222.    Exclusion of Plaintiffs' religious land use is not the least restrictive means of achieving any governmental interest.

223.    Exclusion of Plaintiffs' religious land use is not narrowly tailored to achieve any governmental interest.

224.    Defendants' laws and actions discriminate against Plaintiffs on the basis of religion and religious denomination.

225.    The construction of Plaintiffs' proposed shul, at an estimated cost of at $2 million, would affect interstate commerce.

226.    The construction's effect on interstate commerce would result from, amongst other things, Plaintiffs' fundraising activities related to the construction; the transfer of funds to those it engages to construct the *shul*; the engagement of construction companies to construct the *shul*; the employment of and payments to construction workers either by Plaintiffs or by companies engaged by them; the purchase of necessary materials to construct the *shul*; the

engagement of a landscaping company; the use of interstate highways for the transportation of persons and materials used to construct the *shul*; the use of interstate communication related to construction of the *shul*; and other activities related to the construction of the *shul*.

227.    The operation subsequent to construction of the *shul* would affect interstate commerce, by or through, amongst other things, serving as a site for ongoing fundraising; its receipt of charitable donations from persons working or living outside of the State of New Jersey; the use of means of interstate communication to facilitate the *shul's* ongoing operations; the use of interstate travel related to the *shul's* ongoing operations; the employment of any part-time or full-time employees; and the purchase of goods and services related to the *shul's* ongoing operations and maintenance.

### COUNT I

### Violation of Religious Land Use and Institutionalized
### Persons Act of 2000 – "Substantial Burdens"
### 42 U.S.C. § 2000cc(a)

228.    Paragraphs 1 through 227 are incorporated by reference as if set forth fully herein.

229.    Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that substantial burdens Plaintiffs' religious exercise without using the least restrictive means of achieving a compelling governmental interest.

### COUNT II

### Violation of Religious Land Use and Institutionalized

Persons Act of 2000 – "Nondiscrimination"
42 U.S.C. § 2000cc(b)(2)

230.    Paragraphs 1 through 229 are incorporated by reference as if set forth fully herein.

231.    Defendants have imposed and implemented land use regulations that discriminate

both on their face and as applied to Plaintiffs on the basis of religion and religious denomination.

## COUNT III

### Violation of Religious Land Use and Institutionalized
Persons Act of 2000 — "Equal terms"
42 U.S.C. § 2000cc(b)(1)

232.    Paragraphs 1 through 231 are incorporated by reference as if fully set forth herein.

233.    Defendants have deprived and continue to deprive the Plaintiffs of their right to

the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use

regulations both on their face and as applied to Plaintiffs in a manner that treats religious land

uses on terms that are less than equal to nonreligious assembly and institutional land uses.

## COUNT IV

### Violation of Religious Land Use and Institutionalized Persons Act of
2000 42 U.S.C. § 2000cc(b)(3)(B)
"Exclusion and Limits": Unreasonable Limitation

234.    Paragraphs 1 through 233 are incorporated by reference as if set forth fully herein.

235.    Defendants have deprived and continue to deprive the Plaintiffs of their right to

the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use

regulations both on their face and as applied to Plaintiffs in a manner that unreasonably limits

religious assemblies, institutions, and structures within their jurisdiction.

## COUNT V

**United States Constitution
Violation of 42 U.S.C. § 1983: Fourteenth
Amendment Equal Protection**

236.   Paragraphs 1 through 235 are incorporated by reference as if set forth fully herein.

237.   Defendants have deprived and continue to deprive Plaintiffs of their right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution, by discriminating against them based on religion.

## COUNT VI

**United States Constitution
42 U.S.C. § 1983:
First Amendment Free Exercise of Religion**

238.   Paragraphs 1 through 237 are incorporated by reference as if set forth fully herein

239.   Defendants have deprived and continue to deprive the Plaintiffs of their right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by implementing and imposing land use regulations both on their face and as applied in a manner that burdens the Plaintiffs' religious exercise without being narrowly tailored to achieve any governmental interest, and in a manner that discriminates against the Plaintiffs on the basis of religion.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

    1.   A declaration that the Township's land use ordinances, to the extent that they substantially burden, unreasonably regulate, and discriminate against the

Plaintiffs' religious land use, are void, invalid and unconstitutional on their face and as applied to the Plaintiffs on the ground that they violate the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the Religious Land Use and Institutionalized Persons Act;

2. A declaration that the denial of the Plaintiffs' Application is void, invalid and unconstitutional on the ground that it violates the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the Religious Land Use and Institutionalized Persons Act;

3. An order enjoining the Defendants from applying any provisions of the Toms River Code that preclude the use of the Subject Property as a synagogue or treats places of worship on less than equal terms as nonreligious assembly or institutional uses, including the Code's requirements that the minimum lot width for Houses of Worship shall be 300 feet on lots of more than four acres and 200 feet for lots of four acres or less, the maximum lot building coverage limitation of 15%, the maximum impervious coverage limitation of 40% on lots of more than four acres and 50% on lots of four acres or less with fewer than 50 parking spaces and more than 150 feet from beaches, dunes or the mean high-water line of tidal waters, the minimum lot area requirement of two acres, and the maximum height requirement;

4. An order enjoining the Defendants from applying the Code's conditional use requirements for "Churches and places of worship";

5. An order enjoining the Defendants from applying the Code's new parking requirements for "Churches and places of worship";

6. An order requiring the Defendants to permit "Churches and places of worship" in the RR zoning district;

7. An order reversing the decision of the Township of Toms River Zoning Board of Adjustment, ordering the Zoning Board of Adjustment to grant the Plaintiffs' Application to use the Property as a house of worship, and ordering Defendants to grant Plaintiffs such land use relief necessary to construct its house of worship on the Property as applied for;

8. An order enjoining the Defendants, their officers, employees, agents, successors and all others acting in concert with them from applying their laws in a manner that violates Plaintiffs' rights under the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the Religious Land Use and Institutionalized Persons Act;

9. An award of compensatory damages against Defendants in favor of Plaintiffs as

the Court deems just for the loss of its rights under the United States Constitution and the Religious Land Use and Institutionalized Persons Act incurred by Plaintiffs and caused by the Defendants' laws and actions;

10. An award to Plaintiffs of full costs and attorneys' fees arising out of Defendants' actions and land use decisions and out of this litigation; and

11. Such other and further relief as this Court may deem just and appropriate.

Respectfully submitted by the Plaintiffs this 13th day of January, 2023.

**STORZER & ASSOCIATES, P.C.**

/s/ Sieglinde K. Rath
Sieglinde K. Rath (#048131991)
Christopher K. Costa (#023251993)
Robin N. Pick, admitted *pro hac vice*
9433 Common Brook Road, Suite 208
Owings Mills, MD 21117
rath@storzerlaw.com
Tel: 410.559.6325
Fax: 202.315.3996

*Counsel for Plaintiffs*

**CERTIFICATION**

Pursuant to Local Civil Rule 11.2, I hereby certify that this matter is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding. I do not know of any other party who should be joined in this action.

**STORZER & ASSOCIATES, P.C.**

/s/ Sieglinde K. Rath
Sieglinde K. Rath (#048131991)
Christopher K. Costa (#023251993)
Robin N. Pick, admitted *pro hac vice*
9433 Common Brook Road, Suite 208
Owings Mills, MD 21117
rath@storzerlaw.com
Tel: 410.559.6325
Fax: 202.315.3996

*Counsel for Plaintiffs*

## **CERTIFICATION OF SERVICE**

I hereby certify that on January 13, 2023, a copy of the foregoing was filed electronically and notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.


/s/ Sieglinde K. Rath
Sieglinde K. Rath